The next case for argument today is Justine Gauda v. Commissioner of Social Security. Thank you. Mr. Gordon, you are on the phone, is that correct? How are you feeling? Well enough to argue, Your Honor. Okay, okay. Thank you. I may call. I'm sorry, I just want to make sure my colleagues can hear him, can hear you. Okay, you may proceed, please. Thank you, Your Honor. May it please the Court. A plaintiff in this case is a Vietnam veteran suffering from PTSD symptoms and some associated depression as a result of her combat experiences. I'm going to slow down. The Veterans Administration and Dr. Welch, who understand that from combat, found the plaintiff could not work and was 100% disabled. At the Social Security hearing, the Administrative Law Judge issued a decision and a hypothetical to the judge based on his residual functional capacity that limited plaintiff in working, no work with the public, limited work with others, and other limitations. And what's important is that the vocational experts specifically said with respect to the times that the PTSD would affect the claimant that even with all those restrictions, no job would remain and the claimant was entitled to benefits if any one of four things occurred. One is that if the PTSD flared such that she would be absent one day per month. The second was that if the PTSD flared and there was even one physical outburst per month. The third is that if the PTSD flared and there was one verbal outburst at all, not physical outburst per month, one physical outburst or one verbal outburst. And finally, if the PTSD and the depression were such that she wouldn't be able to concentrate 90% of the day. Social Security uses the term off-task. So if off-task was 10% or greater, then there wouldn't be jobs. The evidence showed that she was terminated job after job after job after job due to outbursts and missed time. So, Mr. Gordon, I do understand that you have arguments on your side, but the standard is substantial evidence and it's very deferential. So what do you think is your strongest argument that a reasonable fact finder would have to find contrary to the ALJ's conclusion? Well, let me address a couple. The one is that the fact finder found that Clayton could have absolutely no contact with the public at all. And there is no evidence from any source that differentiates, and nor does the ALJ, find any evidence that differentiates the contact that she could have with coworkers and the public. In fact, if anything, it's even worse given the history. But there's no evidence whatsoever. Well, but that's not true, right? Because they said that Drs. Jurega and Inman said that she would have no limitation to asking questions or requesting assistance, only moderate limitations in accepting instructions, responding to criticism, moderate limitations with respect to getting along with coworkers without distracting them. Is that not enough for a reasonable mind? There's a difference. I think the question is wrong. The question is not what they said with respect to coworkers and supervisors where they said she would not be able to do it consistently, but rather the judge, the administrative law judge, the finding in this case from the commissioner, from the administrative law judge, was no contact with public. Where is the difference? There is no difference. There is no provider that says that she can have limited contact with coworkers and supervisors, but she could not with the public. Okay, so you're asking – I'm sorry. So I just want to make sure because, you know, the decision we make here is going to influence future cases. As I understand what you just said, the proposition of law that you are asking us to endorse or create would be if an expert concludes that – in which substantial evidence could support being able to interact with coworkers or a supervisor. Is that what we have to find in order to find for you? Absolutely not. Okay, please explain. Right. The question is whether or not there's differentiation, whether the judge has or any of the providers have indicated facts which allow the judge to make that distinction. And in this case, there are no – A, the judge doesn't even set forth any facts. This is why he can't. But is that true? I mean, because wasn't there moderate limitations found by Juriga and Inman about ability to work in coordination with or in proximity to others? I mean, is that – With anybody. And from that – that's what they said. The administrative law judge makes the factual finding that claimant cannot have contact with the public but yet can have contact with supervisors and coworkers. That's the difference, is that the judge makes this finding. It's there. Can't have contact with the public.  Had he made the finding, and we still would oppose it, but had he made the finding that he could have limited contact with the public in the same manner, that he could have limited contact with coworkers and supervisors, it would be a different case. We set that forth because we think it's the easiest, but we also set forth that there is no – there is no evidence here. From every evidence, from Dr. Rettig, the expert, from nurse practitioner Proverse, and this is under the new regs where she has the same weight as a treating source, from the peer counselor Welch, every single one said there would be some limitations to this person's ability to work consistently, and there would be some outbursts. In fact, Proverse even said, I witnessed these outbursts. And consequently, the administrative law judge's finding, zero, no outbursts ever, no time off tasks, can concentrate 100% during the day, and would never have an exacerbation, and the record is incomplete. I'm not going to go through it. With times where, I mean, just really bad situations where she would clearly be absent from work. She's cutting herself. She's scratching herself. When she goes to her little child's school or playtime, she has to go by herself in the corner. She can take them, but she can't be with anybody else. Yes, she can be with friends. She can be at the doctor's office. Thank you. Thank you, Mr. Gordon. Let me just make sure my – Thank you. Okay, Maya, you'll have some time on rebuttal. Thank you. Thank you. Great. Ms. Carter, can you start with the incongruity between no contact with the public, but then you can contact with supervisors? Yes, Your Honor. There is evidence in the record that indicates that substantial evidence supports the finding that Ms. Gowda could have the limited amount of contact with supervisors and coworkers that the ALJ assessed, but that she had additional problems when dealing with the public. She does interact with friends and medical providers throughout the relevant period, which runs from her alleged onset date of May 2019 to her date last insured for Title II benefits, which is December 31, 2019. She's consistently observed by providers to be calm and cooperative, even when she's expressing to them that she's feeling anxiety or frustration. She does have friends that she spends time with during that period, and she even expresses wanting to move to be closer to some of her friends. In contrast, she reports, for example, at page 56, she reports anxiety around speaking to new people. Again, she talks about, as Mr. Gordon alluded to, when she takes her daughter to playtime, it's uncomfortable for her to be around something that's crowded. That's at page 48. She says she doesn't want to expose her daughter to the public. That's at page 53. And she reports that she had issues with customers at her last job. Again, that's the public, and that's at page 49 and 436. So there is ample evidence in the record that she does have additional issues when she is interacting with people. She doesn't know times that are crowded, customers, things like that, that are all precluded by a limitation to no contact with the public. In contrast, the ALJ significantly also limited the amount of time and the type of interactions that she would have with other people, supervisors and coworkers. So her limitations in those areas are significant as well. I'm just not so sure how probative the time with friends and the doctors is, because those are things that when one goes into, one knows that it's going to be time limited. A supervisor is potentially something, you know, eight, nine hours a day. That's not true here, Your Honor, because her work is done predominantly with objects and not with people. So she's not working predominantly with other people. She's doing no work in conjunction with others, so, you know, no tandem work, no teamwork, no group work. And her interactions are all short and simple. So the quality and the time that she is interacting with supervisors and coworkers is quite limited,  What about the argument that was certainly made in the briefs by Ms. Gowda about the vocational expert being incomplete in the hypothetical? Well, that goes to whether substantial evidence supports the RFC finding, because the hypothetical to the vocational expert was based on, was mirrored what the RFC finding was. So substantial evidence, as described here, does support the significant social limitations, and substantial evidence also supports the ALJ's finding that Ms. Gowda, during the relevant period, had significant social or significant concentration and persistence limitations. So she was limited to work with only occasional decision-making, occasional judgment, and occasional changes, and work that was goal-oriented rather than a production pace rate. And, again, there's evidence, substantial evidence in the record, as described in our brief, that supports that. So, again, providers consistently noted intact thought processes, memory, and cognitive functioning. Ms. Gowda, at times, actually denied experiencing depression or anxiety symptoms. She reported doing well or doing good, and that she was able to manage her symptoms effectively. She reported that, during the relevant period, she spent her days managing her household and caring for her infant and cleaning. She reported that she did everything without help. That's at pages 257 and 259. And she did that such that she was repeatedly described by Nurse Provost as a loving and attentive mother to this infant that she was single parenting. Excuse me, that's at page 644 and 648. One of the things that I have spent some time on was Dr. Derricka's and Dr. Inman's assessments. I think an argument was made that it didn't comply with the operation manual, which generally requires that doctors elaborate on the narrative explanation. What is the best argument you have for why I shouldn't be concerned? Well, to remind Your Honor and emphasize that the assessment that is on judicial review is the RFC assessment. And so the ALJ, in assessing the RFC, did elaborate and did detail Ms. Gauta's limitations and abilities in accordance with the regulations. As to Dr. Derricka's and Dr. Inman's assessments, they are still relevant and supportive of that RFC. If the ALJ had adopted those verbatim and simply also said unskilled work, that would be an articulation issue because the RFC was not expressed in accordance with the regulations. But the ALJ took what Dr. Derricka and Inman assessed and spelled it out in a finding that concurred with the regulations. That being said, the statement that Ms. Gauta could do unskilled work in a low-contact setting on a sustained basis is still relevant and supportive of the RFC, including the aspects that we've discussed here today in terms of Ms. Gauta's ability to have some interaction with others. They assessed a low-contact environment, not a no-contact environment. And they specifically assessed that she could work on a sustained basis, which goes to the persistent. What about the attendance limitations, though? Because even Reynolds said that it could result in behavior that could affect attendance. Or Welch and Gauta that said – or Welch saying that it would not be reliable or efficient long-term employment. So a couple – I want to address each in turn. First, I want to emphasize that Drs. Shriga and Inman did not find any attendance limitations. They specifically indicated no limitations or no significant limitations in a number of areas, including specifically – Right, yeah, I'm talking more about Reynolds. Okay. Dr. Reynolds, the ALJ, discounted Dr. Reynolds' opinion for several reasons in accordance with the regulations, including that his report relied heavily on Ms. Gauta's self-report, which itself was inconsistent with the record, as is detailed in our brief at page 37. The ALJ also emphasized that Dr. Reynolds' report was not supported by objective evidence. He actually indicated at page 622 that there were no significant behavioral observations, and the ALJ noted that that, in addition to not supporting significant – more significant limitations, that the significant limitations that Dr. Reynolds assessed were not consistent with the other mental status examinations in the record. As to the evidence submitted to the Appeals Council, Mr. Welch did not give an opinion that would be termed a medical opinion under the regulations. He gave what, by his own terms, was a character reference, and he simply stated that she wouldn't be able to work, which is a statement on an issue reserved to the commissioner that is inherently neither valuable nor persuasive under the regulations. Ms. Provorce's statement, the substantial evidence still supports the ALJ's decision, even considering that opinion under the analysis that we've detailed in our brief that complies with the Perez and the Westerly's cases, namely because the evidence that the ALJ emphasized in evaluating Dr. Griega's and Dr. Inman's assessments, as well as Dr. Reynolds' opinion, also would apply equally to Nurse Provorce's statement. And I'll note that, in particular, some of the things that she mentions, like Dr. Reynolds' opinion, are not borne out by the record. Mr. Gordon referred to Nurse Provorce stating that she had seen outbursts. There's simply no reference to that in the record during the relative period of May of 2019 to December of 2019. So, again, where that opinion just simply isn't consistent with or supported by the record, it wouldn't undermine the substantial evidence supporting the ALJ's decision. If Your Honors have no further questions, I ask that you affirm. Thank you so much. Thank you. And, Mr. Gordon, you've got three minutes. Thank you. I want to address first the factual statement that, and I'm losing my voice a little bit, the factual statement that the record doesn't show objective signs that she's always normal when she goes in. That's not correct. What is correct is that they show that there are times that, just like the condition itself, there are times when they're bad and times when they aren't. And let me set forth February 19, TR-479, spontaneous speech and anxious mood, 472 good days and really, really, really bad days. April 2019, 458, observed to be short fused. June 2019, 429, 432, withdrawn flat effect. Depressed mood also shown. 9 of 19, flat effect. Depressed mood and overwhelmed. That's 397, 398. 390, 220, depressed effect flat. 320, TR-385, yelled and threw things, went upset. 353, trauma, fairly well, as the U.S. attorney has said, until it pops up. And 1020, deadly fear of scratching herself until it bleeds. And with respect to nurse practitioner provost, where the U.S. attorney indicated findings in her record, the conclusion that the expert made, not us lawyers, but that nurse provost, is that Justine often has mood swings which are triggered by minor agitations that are unpredictable and severe. The history of PTSD manifests in insomnia, mistrust, difficulty concentrating, perfectionism. She often feels hopeless. I have witnessed her in a manic mood. I have witnessed inappropriate outbursts while interacting with others. Your Honor, one last thing, and that is what period of time. We don't look at this, you know, May of 19 to December of 19. That's the date last and short. But quite honestly, in an analysis situation, if somebody falls off a building at 1159 at 1230, 1231, as long as the incident occurs before 1230, you look at whether the condition would last or is expected to last for a year. And that's why all and the regulations which we cited in the brief that says that the commissioner and the ALJ have to consider the conditions beforehand. They use the term one year, but that's loose. In any event, this is a condition that waxes and wanes, that gets worse. And when it's worse, she can't work. And you have to look at the entire period. You can't just look at a day or two. You have to look at the entire period. Thank you, Your Honor. Thank you so much. We will take this case under advisement. That does conclude argument for the cases that we have calendared today. We do have cases on submission. And for the record, I will note that they are Caltenko v. GH Foods. That's 22-2791. And U.S. v. Sean Peter, 22-1693. I want to thank the Corp's office and their team for keeping everything moving.